NR:MEG
F.#2020R00128

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE APPLE iPHONE STORED IN AN FBI BAG BEARING EVIDENCE SERIAL NUMBER E6213295 AND CURRENTLY LOCATED AT THE FBI FIELD OFFICE IN KEW GARDENS, NEW YORK | APPLICATION FOR A SEARCH WARRANT FOR AN ELECTRONIC DEVICE<br><br>Case No. 20-MJ-322 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Christopher Kottmeier, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been for approximately four years.  I am currently assigned to Squad C-13 in the New York Field Office, Brooklyn/Queens Resident Agency, which investigates violent gang criminal enterprises, including narcotics trafficking by those enterprises.  These investigations have been conducted both overtly and covertly.  I have experience debriefing confidential informants, executing search warrants, and reviewing and analyzing bank and

telephone records, as well as electronic data recovered from computers and cellular telephones.

3.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.  The property to be searched is the Apple iPhone stored in an FBI bag bearing evidence serial number E6213295, hereinafter the "Device." The Device is currently located at the FBI Field Office in Kew Gardens, New York.

5.  The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6.  As set forth below, the Device was seized from Jonathan Medina, also known as "Trigg" ("MEDINA") on January 14, 2020, when he was arrested by the FBI and other law enforcement agencies pursuant to an arrest warrant issued by the Honorable Sanket J. Bulsara. The arrest warrant was predicated on a complaint charging MEDINA and six co-conspirators, including JAMES ALBERT, also known as "Jah" and "Jah Blize" ("INMATE ALBERT") and TREVOR BODDEN, also known as "Bless" ("BODDEN"), with Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Sections 846, 841, and Conspiracy to Use a

Facility of Interstate Commerce to Facilitate Bribe Receiving, in violation of Title 18, United States Code, Section 371 (20-M-26). On February 11, 2020, an indictment was filed in the Eastern District of New York charging MEDINA and others with two counts of Conspiracy to Violate the Travel Act (i.e., using a facility of interstate commerce to facilitate bribery and bribe receiving), in violation of Title 18, United States Code, Section 371, and two counts of Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Sections 846, 841 (20-CR-64 (AMD)).

7. MEDINA was arrested in connection with an investigation conducted by FBI agents and investigators from the New York City Department of Investigation ("DOI") into a contraband smuggling ring involving, among other things, the payment to and receipt of bribes by New York City Department of Correction ("DOC") correction officers in exchange for the introduction of illegal drugs into the George R. Vierno Center ("GRVC") and the Otis Bantum Correctional Center ("OBCC"), correctional facilities located in New York City that are part of the series of DOC facilities located on Rikers Island.

8. As set forth below, MEDINA used a cellular telephone assigned telephone number (347) 546-0311 (the "0311 Number") to facilitate his role in the drug smuggling operation. I have reviewed subscriber information for the 0311 Number, which revealed that the 0311 Number was subscribed to by "Gangstas Making Astronomical Communi".[1] The records showed that the 0311 Number was activated on new equipment on January 12, 2019;

---

[1] I am aware that, prior to his arrest, MEDINA was employed by "Gangstas Making Astronomical Community Changes" ("G-MACC").

specifically, a silver iPhone 8 bearing Electronic Serial Number 089394612105785353, and that it remained active through the date of MEDINA's arrest. The Device, which I have viewed, is consistent in design and color with images of the silver iPhone 8 that I viewed on the internet. Accordingly, I believe that the 0311 Number has been assigned to the Device since January 12, 2019, and that MEDINA used the Device to facilitate the drug smuggling operation, as set forth below.[2]

9. The evidence set forth below is an excerpt of the relevant portions of the complaint for which I was the affiant, and upon which Magistrate Judge Bulsara issued the arrest warrant for MEDINA.

* * *

---

[2] During the course of the investigation discussed herein, the 0311 Number—i.e., the Device—was the subject of a court-authorized Title III warrant. Specifically, on June 28, 2019, the Honorable Andrew L. Carter, United States District Judge in the Southern District of New York, signed an order authorizing the interception of wire communications over the 0311 Number; on July 2, 2019, the government sought and obtained an Amended Order for SUBJECT TELEPHONE #1 to correct an error with respect to the Electronic Serial Number. Interception of wire communications on the 0311 Number commenced on July 3, 2019 and expired on August 1, 2019. Communications intercepted over the 0311 Number confirmed that MEDINA was the user of the 0311 Number, but because this affidavit is intended to set forth only sufficient evidence to support the issuance of the warrant sought herein, the government does not set forth or rely upon communications intercepted pursuant to the TIII warrant to establish probable cause in this affidavit.

B.  *Bribes to Correction Officer Jane Doe*

i.  <u>Interview of Correction Officer Jane Doe</u>

10.  On or about September 5, 2019, a correction officer whose identity is known to the affiant ("CO JANE DOE") voluntarily participated in an interview with law enforcement agents in Brooklyn, New York during which she admitted to having received payments to her Cash App account for smuggling contraband into the GRVC on numerous occasions.

ii.  <u>First March 2019 Bribe and Contraband Delivery</u>

11.  On February 19, 2019, at approximately 4:11 p.m., a GRVC inmate whose identity is known to the affiant ("GRVC Inmate 1") used the Securus system[3] to call BODDEN at a number subscribed to by BODDEN ending in 0423 (the "0423 Number").  As set forth below, I believe that in this call the men discussed GRVC Inmate 1's interest in having BODDEN supply him with marijuana that GRVC Inmate 1 would share with "Jah Blize" [i.e., INMATE ALBERT]:

> INMATE 1: I'm trying to get, um, four Oakland Raider jerseys. Niggas got Pink Panties on the line right now, you heard?
> BODDEN: Oh word?
> INMATE 1: Gangsta. You just gotta make it to the Jungle to drop it off to them and, more or less, we lit from there.

---

[3]  Calls placed using the Securus system are recorded and subject to monitoring.  To use the Securus system, each inmate records voice exemplars that enable the system to recognize the inmate's voice.  The inmate is then assigned a PIN number permitting access to the system.  Although inmates are required to only use their own PIN number to make outgoing phone calls, in practice, inmates frequently use other inmates' PIN numbers to disguise the source of their calls.

| BODDEN: | …whatchu mean, like, we lit from there? Like, it's yours? That's yours, or…? |
| INMATE 1: | Um, between me and the Blackwall, um, Jah Blize. |
| BODDEN: | That's it? |
| INMATE 1: | That's it. But you already know, Whoopty in my whip so he good, and the Iceys – you already know how I do, every time I get here I make sure the Iceys is good. |

GRVC Inmate 1 then provided BODDEN with a telephone number ending in 0311 [i.e., the Device], which he identified as belonging to "Trigg" [i.e., MEDINA] (the "0311 Number").[4] I am aware that DOC's Gang Intelligence Unit has intercepted messages from incarcerated gang members that identify specific coded terms used by Bloods gang members. The seized paperwork provided explanations of code words including, among others, "Oakland Raiders = weed" and "Pink Panties = police." Based on my training and experience and the investigation to date, I believe that GRVC Inmate 1 was seeking to get marijuana ("4 Oakland Raider jerseys") from BODDEN and indicating that they had a correction officer ("Pink Panties") who could facilitate bringing the drugs into the GRVC. I further believe that GRVC Inmate 1 was asking BODDEN to bring the marijuana to Brooklyn (the "Jungle") to deliver it to MEDINA, whose telephone number he provided as belonging to the person to

---

[4] I am aware that the 0311 Number belongs to MEDINA because, among other reasons, a review of New York State Department of Correction and Community Supervision records reveals that the telephone number was listed on another inmate's call list as being registered to "John Medina" at an address that was one digit off of the address I know to have belonged to MEDINA. I am also aware that MEDINA identified himself as "Trigg" in a call to another inmate that was made over the Securus system.

whom the marijuana should be delivered. I further believe that the use of the term "Jah Blize" was a reference to the nickname for INMATE ALBERT.

12. Later that same day, at approximately, 4:31 p.m., INMATE ALBERT used the Securus system to call MEDINA on the 0311 Number:

> ALBERT:    Yo, listen. Somebody going to be – somebody going to be hoffing at you sometime soon.
> MEDINA:    Today?
> ALBERT:    I don't know if it's going to be today, but they gonna drop something off on you.
> MEDINA:    Alright.

13. Based on my training and experience and the investigation to date, I believe this call reflects INMATE ALBERT informing MEDINA that someone—whom I believe to be BODDEN based on the earlier call—would be contacting him to provide MEDINA illegal drugs in the near future ("they gonna drop something off on you").

14. Several days later, on March 3, 2019, INMATE ALBERT spoke to BODDEN on the 0423 Number and expressed frustration that MEDINA was unreliable. BODDEN informed INMATE ALBERT that BODDEN was ready to provide contraband, which I believe was marijuana because he referred to it as "Oakland Raiders." INMATE ALBERT told BODDEN that his "bitch" [i.e., CO JANE DOE] lives in Queens. I am aware that, according to DOC records, CO JANE DOE resided in Queens at this time. INMATE ALBERT provided BODDEN with a telephone number for CO JANE DOE (the "CO JANE DOE Number") and instructed BODDEN to text the number and say "Jah said to call you instead for the clothes…actually for her to come pick up the gear, cause you got my clothes…" INMATE ALBERT instructed BODDEN to tell "her" [i.e., CO JANE DOE] that

"he" [i.e., BODDEN] is already in Queens. During the call, BODDEN told INMATE ALBERT that "that person" [i.e., CO JANE DOE] texted back and said "Yeah what's up, give me a minute."

15.     I believe that BODDEN met with CO JANE DOE on March 3, 2019 based on the following. On that day, BODDEN confirmed during telephone calls with INMATE ALBERT and another GRVC inmate whose identity is known to the affiant ("GRVC Inmate 2") that "everything is solidified" and that "everything 110" and told INMATE ALBERT that he [i.e., BODDEN] saw his "wife" [i.e., CO JANE DOE]. BODDEN further told GRVC Inmate 2 to make sure he "grabs a ticket" when the "Oakland Raider tickets" [i.e., marijuana] "touchdown."

16.     A review of records obtained from Cash App for the accounts belonging to BURGESS and BODDEN[5] for a period beginning on February 1, 2019 reveals that the first activity on each account occurred on March 4, 2019 when both users received payments from third party accounts, along with notes indicating that the payments were made on behalf of GRVC inmates. As a result, I believe that the payments received by BURGESS and BODDEN were proceeds from the sale of contraband by INMATE ALBERT and GRVC Inmate 2 in the GRVC.

17.     On the evening of March 4, 2019, at approximately 7:48 p.m., INMATE ALBERT spoke to MEDINA and informed him that because ALBERT could not get in touch

---

[5]     Personal identifying information to include name, date of birth, last four of social security number, and address information links BODDEN to his Cash App account.

with MEDINA, he had made alternative arrangements for the delivery of the contraband. ("I took care of that already" and "if you had answered the phone, I would have been able to tell you what was going on").

### iii.   Second March 2019 Bribe and Contraband Delivery

18.     On March 17, 2019, INMATE ALBERT spoke to BODDEN on the 0423 Number and asked BODDEN if BODDEN still had "that number" to which BODDEN confirmed that he did and it was a number with the same area code as the CO JANE DOE Number. Based on the investigation to date, I believe that BODDEN was confirming that he still possessed the telephone number to contact CO JANE DOE.

19.     On Monday, March 18, 2019 and Wednesday, March 20, 2019, BODDEN spoke with GRVC Inmate 2 and INMATE ALBERT and communicated, in sum, substance and part, that a delivery would be coming in the near future ("Wednesday, everything lit") and (Everything in a minute, you heard?").

20.     Call detail records reflect a call between the 0423 Number and the CO JANE DOE Number on March 20, 2019.

21.     On March 21, 2019, INMATE ALBERT contacted BODDEN on the 0423 Number and informed BODDEN, in sum, substance and part, that INMATE ALBERT was "still waiting" on the delivery.

22.     While reviewing surveillance video inside the GRVC housing area 7B on March 22, 2019 between approximately 06:00am – 06:55am, I observed CO JANE DOE enter the housing area and converse with INMATE ALBERT at the front of the housing area,

near the correction officer's station. Shortly after, I observed INMATE ALBERT enter his cell. I then observed CO JANE DOE walk to INMATE ALBERT's cell and converse with him. A few minutes later, CO JANE DOE leaned into the open doorway of INMATE ALBERT's cell (outside of the view of the surveillance cameras) and then returned to the front of the housing area.

23.     Based on my discussions with DOC staff, I am aware that even though CO JANE DOE was assigned to the GRVC on that date, she was not assigned to work in GRVC housing area 7B where INMATE ALBERT's cell was located. I am further informed by DOC staff that, based on her assignment on that day, her job responsibilities would not have required her to interact with INMATE ALBERT or visit housing area 7B.

24.     Later that same day, during a call between INMATE ALBERT and BODDEN on the 0423 Number, INMATE ALBERT informed BODDEN that he [i.e., BODDEN] "forgot something very important," which, I believe reveals that INMATE ALBERT had received a package, but that the package did not contain an item or items that INMATE ALBERT had expected to be included.

25.     Records obtained from Cash App reflect that on or about March 26, 2019, CO JANE DOE[6] received a $1,000.00 payment from BURGESS's Cash App account. Furthermore, between March 21 and March 30, 2019, a review of Cash App records for the accounts controlled by BURGESS and BODDEN show that, following confirmation of the

---

[6]     Personal identifying information to include name, date of birth, last four of social security number, and address information links CO JANE DOE to her Cash App account.

March 22, 2019 delivery, both users received payments from third party accounts, along with notes indicating that the payments were made on behalf of GRVC inmates. I believe that most of the payments received by BURGESS and BODDEN through Cash App were proceeds of the contraband sold by INMATE ALBERT and GRVC Inmate 2 in GRVC.

iv.     April 2019 Bribe and Contraband Delivery

26.     On April 4, 2019, INMATE ALBERT contacted BODDEN on the 0423 Number and asked "Did you see my bitch on Tuesday?" BODDEN responded "Nah, that's what I'm saying – you didn't tell your wife to hit me" and asked INMATE ALBERT to make sure "wifey" knows about the new "9X," which I understand to be a reference to his new telephone number. INMATE ALBERT instructed BODDEN to "just text her." Based on my training and experience and the investigation to date, I believe INMATE ALBERT was inquiring whether BODDEN had contacted CO JANE DOE ("my bitch") and that BODDEN informed INMATE ALBERT that CO JANE DOE had not contacted him ("you didn't tell your wife to hit me.")

27.     Later that same day in a telephone call between BODDEN and INMATE ALBERT, BODDEN appeared to confirm that he had been in contact with CO JANE DOE, stating "Yeah, yeah, yeah" to which INMATE ALBERT replied by stating "Alright, copy."

28.     Cash App records reflect a payment of $1,000.00 from BURGESS to CO JANE DOE on April 4, 2019.

29.     While reviewing surveillance video inside the GRVC housing area 7B from April 5, 2019 between approximately 6:35am – 6:50pm, I observed CO JANE DOE enter the

Building 7 control station. Shortly after, I observed INMATE ALBERT exit housing area 7B. I then observed CO JANE DOE hand INMATE ALBERT a bulky white item at the entrance of the Building 7 control station. INMATE ALBERT is then seen re-entering housing area 7B with the bulky white item. INMATE ALBERT then entered his cell and, shortly after, exited without the bulky white item.

30.     Based on my discussions with DOC staff, I am aware that, even though CO JANE DOE was assigned to GRVC that day, her job responsibilities would not have required her to deliver any items to INMATE ALBERT.

31.     A review of records obtained from Cash App for the Cash App accounts belonging to BURGESS and BODDEN reveals that both accounts received payments between April 4, 2019 and April 9, 2019 from third party accounts, along with notes indicating that the payments were made on behalf of GRVC inmates. I believe that most of the payments received by BURGESS and BODDEN through Cash App were proceeds of the contraband sold by INMATE ALBERT and GRVC Inmate 2 in GRVC.

    v.     Suboxone-Related Communications

32.     On February 19, 2019, at approximately 11:30 a.m., INMATE ALBERT used the Securus system to call MEDINA over the 0311 Number. The following reflects relevant portions of the call:

| | |
|---|---|
| ALBERT: | I need – somebody going to call you, man and pick them – pick that up. Just have that ready. |
| MEDINA: | Alright. The thing I spoke to you about? |
| ALBERT: | Yeah. You still got 35? |
| MEDINA: | Uh, no. |
| ALBERT: | No! |
| MEDINA: | No, I don't got 35 no more nigga. I got 30… |

| ALBERT: | C'mon. You doing a lot bro. You doing a lot bro. You wildin'. |
| MEDINA: | Alright, I can get five more… |
| ALBERT: | Well get more than five then. Get more than five more then man. |
| MEDINA: | No, I gotta call. Son, I'm on my son's schedule. Because you know they only get them shits by how they get them shits… |

33.     Based on my training and experience, and the investigation to date, I believe that INMATE ALBERT was informing MEDINA that MEDINA was going to be contacted by someone who would seek to get narcotics from him ("pick that up") and that they were discussing a quantity of suboxone strips[7] ("you still got 35" and "I got 30").  I believe INMATE ALBERT and MEDINA were discussing suboxone strips, as opposed to other forms of contraband, for several reasons.  First, they were discussing a relatively large number of items ("35" and "30"), which is consistent with suboxone strips which are very small and thin (each strip being smaller and thinner than a strip of chewing gum, for instance).  Second, during a call more than a month later on May 2, 2019 at approximately 6:01 p.m., INMATE ALBERT and MEDINA again discussed the numbers "30" and "35" but this time in a manner that made more clear that they were discussing suboxone strips:

| ALBERT: | I thought you had – you told me you had 30 for me bro. |
| MEDINA: | For what? |
| ALBERT: | You had 30 singles not 30 boxes, bro. |
| MEDINA: | Hell no, boy, you know how much. I had 35 singles for you, that I pushed you. |
| ALBERT: | I thought you had 30 boxes. You said 'Yo I got 30 boxes.' |

---

[7]     A suboxone strip is a film that dissolves when placed under the tongue, thereby releasing the opiate that it contains.  Based on my training and experience, and discussion with other law enforcement agents, I am aware the suboxone strips are often smuggled into DOC facilities as contraband and sold to inmates because when ingested, the suboxone strips produce a drug-induced "high."  Suboxone is a Schedule III controlled substance.

| | |
|---|---|
| MEDINA: | Hell no, boy. You know how much for 35 singles – that's 130. |
| ALBERT: | That's not – yo, how much is 30 boxes? |
| MEDINA: | It's gonna be like, let me see – that's – you talking about like 3500 or something. |
| ALBERT: | 3500? |
| MEDINA: | Yeah, they 130 a box right now and it comes 30 -35, I think 35 in it. |
| ALBERT: | So, if I give you 35, you'll get 30 boxes? |
| MEDINA: | Yeah I'll get 30 boxes. I might have to holler at my son and see if he can cover that because it's different out here in regards to how that shit come around. |
| ALBERT: | Alright, so find out how much he can cover. I need that. |
| MEDINA: | Alright, I can do that. |

34.     Based on my training and experience and the investigation to date, I believe that INMATE ALBERT and MEDINA were discussing the price of suboxone single strips ("[y]ou know how much for 35 singles – that's 130" and "they 130 a box right now and it comes 30 -35, I think 35 in it").  My belief is partially informed by my knowledge that suboxone strips are typically packaged as 30 strips per box.  A little more than a week later, on February 28, 2019, at approximately 6:03 p.m., INMATE ALBERT called MEDINA once again:

| | |
|---|---|
| MEDINA: | What's poppin' though? Hey yo, I reached out to your mans too. I gotta get a date to get with him, you heard? |
| ALBERT: | Yeah, man. I been waiting on you, bro. |
| MEDINA: | Nah, he hit me up the other night nigga…I got them shits on deck. That's what I'm saying – I'm tired of walking around with them shits. So I got them in the crib – I'ma bring them to work tomorrow and just tell him to meet me somewhere… |

Based on my training and experience and the investigation to date, I believe that INMATE ALBERT and MEDINA were discussing contraband, and MEDINA was indicating that he was in possession of the requested items and prepared to deliver the material ("got them shits on deck") and that he did not want to have the contraband on his person ("I'm tired of

walking around with them shits") and so that he intended to store them at his work ("I'ma bring them to work tomorrow").

35.     On or about March 5, 2019, at approximately, 8:16 p.m., INMATE ALBERT called MEDINA.  During the call, MEDINA told INMATE ALBERT, "I get two years for getting caught with what I got waiting on you, you know what I'm saying," which I believe was a reference to the fact that MEDINA could be arrested and sentenced to jail time for possessing drugs.  The following day, on or about March 6, 2019, at approximately, 4:26 p.m., INMATE ALBERT called MEDINA and asked "Did you speak to my man?" to which MEDINA replied, "Yeah. Yeah, I dropped that on him last night . . . son came through to pick that up."  Based on my training and experience and the investigation to date, I believe that MEDINA was confirming that he had passed the illegal drugs to INMATE ALBERT's contact the night before ("I dropped that on him last night.").   Based on my review of call detail records as well as other Securus calls, I believe that MEDINA was indicating that he provided the suboxone strips to BODDEN.

36.     During an April 14, 2019 call between an unidentified GRVC inmate and MEDINA on the 0311 Number, MEDINA stated to the unidentified GRVC inmate in sum, substance and part, "Yeah, tell Jah [i.e., INMATE ALBERT] I said what up. Ask him if he got that package I sent him too. He never called me, never told me nothing."

37.     On April 26, 2019, at approximately 6:11 pm., GRVC Inmate 2 spoke to BODDEN on the 0423 Number and told BODDEN that "he" [i.e., INMATE ALBERT] told him [i.e., GRVC Inmate 2] to holler at BODDEN to see "what's up with them orange sodas." During a subsequent call on April 27, 2019 at approximately 10:51 a.m., BODDEN told

GRVC Inmate 2 that "the Icey" [i.e. BODDEN] "did his part" and further stated "even the other shits you asked me for – son kept asking for – yeah, even those too." BODDEN then asked GRVC Inmate 2 to tell "bro" [i.e. INMATE ALBERT] to call him. INMATE ALBERT then called BODDEN on the 0423 number a few minutes later, at approximately 11:09 a.m., and discussed what was in the package he [i.e., INMATE ALBERT] received. Based on my training and experience and the investigation to date, I believe that GRVC Inmate 2 was telling BODDEN that INMATE ALBERT was asking about the suboxone strips ("orange sodas"). My belief is based in part on my knowledge that suboxone strips are orange in color.

38.     As previously discussed, on May 2, 2019 at approximately 6:01 p.m., during a telephone call with MEDINA, INMATE ALBERT confirmed that he had received the suboxone strips from MEDINA. Specifically, INMATE ALBERT said, "I thought you had – you told me you had 30 for me, bro. You had 30 singles, not 30 boxes, bro," to which MEDINA replied, "I had 35 singles for you, that I pushed you."

39.     I am aware that approximately one week later, on or about May 11, 2019, DOC staff conducted a search of the housing area in the GRVC where INMATE ALBERT was incarcerated. During that search, DOC staff recovered 33 suboxone strips and two small packages of a substance appearing to be marijuana from the shower area.

40.     On or about May 15, 2019, at approximately, 1:20 p.m., INMATE ALBERT called MEDINA to again inquire about the availability of suboxone:

> ALBERT:     Yo did you find out about those, from the bro?
> MEDINA:     I gotta call him back. He told me to hit him back, he was gonna holler at his mans. So I gotta wait.

| ALBERT: | Yeah, I'm saying – I need to know what time, like, I need to know what's going on with that…I got the baby-love on deck bro, so I need to know. |
|---------|---|
| MEDINA: | […] I'ma holler at son. So he definitely gonna wanna jump on that anyway. |
| ALBERT: | Alright, man. But I got a little something set to the side for you. If anything man, I'll just have you hit the wife up and go get that. |

41.     Based on my training and experience and the investigation to date, I believe that initially, INMATE ALBERT was asking whether MEDINA has been able to obtain suboxone strips from MEDINA's contacts ("did you find about those") and MEDINA indicated that he waiting to hear back ("So I gotta wait").  I further believe that INMATE ALBERT was indicating that he had funds ready for the purchase ("I got the baby-love on deck") and that his statement about "the wife" was a reference to his wife, BURGESS.

vi.     <u>Additional Payments</u>

42.      In the course of the investigation, I have identified four other occasions in April and May 2019 in which CO JANE DOE received $1,000 Cash App payments from BURGESS.  Based on my training and experience and the investigation to date, I believe that in each instance BURGESS made payments to CO JANE DOE, she did so to facilitate the delivery of contraband into the GRVC.

* * *

43.     The Device is currently in the lawful possession of the FBI.  It came into the FBI's possession in the following way:  the device was seized incident to the arrest of MEDINA pursuant to a lawfully issued arrest warrant.  Therefore, while the FBI might already have all necessary authority to examine the Device, I seek this additional warrant out

17

of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

44.     The Device is currently in storage in the Eastern District of New York at the FBI Field Office in Kew Gardens, New York.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.

## TECHNICAL TERMS

45.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other

information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the

ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable

storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique
numeric address used by computers on the Internet.  An IP address is a series
of four numbers, each in the range 0-255, separated by periods (e.g.,
121.56.97.178).  Every computer attached to the Internet computer must be
assigned an IP address so that Internet traffic sent from and directed to that
computer may be directed properly from its source to its destination.  Most
Internet service providers control a range of IP addresses.  Some computers
have static—that is, long-term—IP addresses, while other computers have
dynamic—that is, frequently changed—IP addresses.

i.  Internet: The Internet is a global network of computers and other electronic
devices that communicate with each other.  Due to the structure of the Internet,
connections between devices on the Internet often cross state and international
borders, even when the devices communicating with each other are in the
same state.

46.     Based on my training, experience, and research, I know that the Device has
capabilities that allow it to serve as a wireless telephone, digital camera, portable media
player, GPS navigation device, and PDA.  In my training and experience, examining data
stored on devices of this type can uncover, among other things, evidence that reveals or
suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

47.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

48.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    b.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to

draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

49.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

50.  *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not

involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

51.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Christopher Kottmeier
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before
me On April 22, 2020

/s Roanne L. Mann
THE HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The property to be searched is the Apple iPhone stored in an FBI bag bearing evidence serial number E6213295, hereinafter the "Device." The Device is currently located in the Eastern District of New York at the FBI Field Office in Kew Gardens, New York.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of Title 21, United States Code, Sections 846, 843 and 841, and involve Jonathan Medina, Trevor Bodden and James Albert since January 1, 2019, including:

   a.  lists of customers and related identifying information;

   b.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   d.  any information recording Jonathan Medina's schedule or travel from January 1, 2019 to the present;

   e.  all bank records, checks, credit card bills, account information, and other financial records;

   f.  evidence of association between Jonathan Medina, Trevor Bodden and James Albert, including wire and electronic communications and photographs.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.